UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

LANCE FREDERICK,

        Plaintiff,

v.                                  Case Number 06-11549-BC
                                       Honorable Thomas L. Ludington

FEDERAL-MOGUL, INCORPORATED,

        Defendant.

_____ /

### ORDER GRANTING DEFENDANT'S MOTION TO DISMISS, DENYING AS MOOT DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S EXPERTS AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL EXPERT REPORTS AS EXHIBITS IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE EXPERTS, AND DISMISSING COMPLAINT WITH PREJUDICE

In his amended complaint [Dkt. # 33], filed December 20, 2006, Plaintiff Lance Frederick seeks compensation from his employer, Defendant Federal-Mogul Corp., based on an alleged "agreement" that he had with Defendant concerning Plaintiff's "conceptualiz[ation] and invent[ion] [of] a new machine and process for the manufacturing of engine bearings." Plaintiff alleges that, under the agreement, Defendant agreed to (1) keep his concept, or invention, confidential, (2) fairly compensate him separately from his wages if Defendant ever commercially used the process, and (3) restrict the use of the process to Defendant's Greenville, Michigan, plant. Plaintiff's amended complaint alleges six state-law causes of action, including trade secret misappropriation (count I), quantum meruit (count II), equitable estoppel (count III), promissory estoppel (count IV), breach of express or implied contract (count V), and conversion of intellectual property (count VI).

Now before the Court are three motions: (1) Defendant's motion to strike Plaintiff's experts [Dkt. # 114], (2) Defendant's motion to dismiss [Dkt. # 115], and (3) Defendant's motion for

summary judgment [Dkt. # 116]. Defendant's motion to dismiss asserts that this Court lacks jurisdiction over Plaintiff's claims, thus, the Court will address Defendant's motion to dismiss prior to addressing the merits of Defendant's motions to strike Plaintiff's experts and for summary judgment.

In its motion to dismiss, filed September 8, 2008, Defendant argues two grounds for dismissal. First, Defendant contends that the National Labor Relations Board ("NLRB") possesses exclusive jurisdiction over Plaintiff's claims because the claims purport to arise out of, and seek relief that would condone, direct dealing regarding terms and conditions of employment between Defendant, an employer, and Plaintiff, an individual union member, in violation of the National Labor Relations Act ("NLRA"), 29 U.S.C. 158(a)(5), which mandates collective bargaining with Plaintiff's union. Second, Defendant contends that Plaintiff's claims are pre-empted by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), because resolving Plaintiff's claims will require the Court to interpret the collective bargaining agreement ("CBA") that governs the terms and conditions of Plaintiff's employment; Defendant argues that Plaintiff's claims are time-barred under § 301.

Plaintiff filed a response [Dkt. # 133] on October 16, 2008, arguing that Plaintiff's claims are not pre-empted, because the CBA does not apply to Plaintiff's "invention" and resolution of Plaintiff's claims does not involve an interpretation of the CBA. Defendant filed a reply [Dkt. # 143] on October 30, 2008. The Court has reviewed the parties' submissions and finds that the facts and the law have been sufficiently set forth in the motion papers. The Court concludes that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. *Compare* E.D. Mich. LR 7.1(e)(2). Furthermore, the

Court finds that the merits of Defendant's motion to dismiss require dismissal of Plaintiff's complaint, accordingly, the Court will not reach the merits of Defendant's motions to strike Plaintiff's experts or for summary judgment.

## I

On March 31, 2006, Plaintiff filed a complaint in this Court, alleging the same six counts as currently alleged in his amended complaint, listed above, and an additional count requesting a declaratory judgment that Plaintiff's claims are post-petition claims under 28 U.S.C. § 959(a), such that they are not affected or prohibited by the automatic stay provisions of the U.S. Bankruptcy Code.[1]

On October 19, 2006, this Court issued an order for Plaintiff to show cause why the case should not be dismissed for lack of subject matter jurisdiction. The Court noted that Plaintiff had alleged diversity jurisdiction, but that he had not plead complete diversity, as required under 28 U.S.C. § 1332. Plaintiff responded to the order to show cause [Dkt. # 22] and requested leave to amend the complaint. Plaintiff sought to withdraw his allegations of diversity jurisdiction, and asserted that the Court has jurisdiction under 28 U.S.C. § 1334(b), which grants federal district courts "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." On December 14, 2006, the Court granted Plaintiff leave to file an amended complaint. Plaintiff did so on December 20, 2006.

---

[1] On October 1, 2001, Defendant had filed a petition for reorganization under 11 U.S.C. §§ 1101 et seq., in the U.S. Bankruptcy Court for the District of Delaware. On August 3, 2005, Plaintiff filed a complaint arising out of the same set of events alleged in this action in a Michigan trial court, and that court ruled, on October 5, 2005, that the action was stayed by the automatic stay provisions of 11 U.S.C. § 362. At the time that Plaintiff filed his initial complaint in this Court, his state appeal was pending. Subsequently, on December 19, 2006, the Michigan appellate court affirmed the trial court's ruling that the action was stayed.

Meanwhile, on May 1, 2006, Defendant filed a motion to dismiss [Dkt. # 2], arguing that the bankruptcy stay under 11 U.S.C. § 362 operated to bar Plaintiff from pursuing state law claims in this Court. The Court found that Plaintiff's claims arose after Defendant filed for bankruptcy and were thus properly considered "post-petition debts . . . to which the automatic stay provision does not apply, resulting in the application of relevant non-bankruptcy law."

Defendant also argued that the *Rooker-Feldman* doctrine stripped the Court of jurisdiction based on Plaintiff's previous filing of a state-court suit. The Court found that the doctrine did not extinguish federal jurisdiction because at the time that Plaintiff filed his complaint in this Court, the Michigan Court of Appeals had not yet issued its decision. The Court also rejected Defendant's arguments concerning issue preclusion, because whether bankruptcy law forecloses Plaintiff from pursuing his state law claims is a question of law, not a question of fact. Accordingly, on February 21, 2007, the Court denied Defendant's motion to dismiss. The Court also stayed the proceedings for ninety days to permit the parties to bring the issue before the bankruptcy court in which Defendant's bankruptcy is proceeding. On June 11, 2007, the Court issued a scheduling order.

On June 12, 2007, the Court issued a second order for Plaintiff to show cause why the case should not be dismissed for lack of subject matter jurisdiction. The Court reiterated its concerns regarding complete diversity under 28 U.S.C. § 1332. The Court further noted that its ruling that Plaintiff's claims are post-petition claims not subject to an automatic stay in bankruptcy did not automatically transform his state law claims into "civil proceedings arising under title 11, or arising in or related to cases under title 11." *Id.* § 1334(b). After receiving Plaintiff's response, on June 29, 2007, the Court found that Plaintiff's pleadings were sufficient to establish subject matter jurisdiction under § 1334(b), because a judgment against Defendant in this case could alter its

liabilities in the bankruptcy proceedings.

## II

Plaintiff is a tool and die maker employed by Defendant. Plaintiff is, and was at all times relevant to this action, a member of the United Auto Workers ("UAW") union, and his "work was controlled by a [CBA] between [Defendant] and the UAW." Am. Compl. ¶ 2.[2] The CBA was entered into by Defendant and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its Local 1158 ("the union"). Under the CBA, Defendant recognizes the union as the exclusive bargaining agent in regard to rates of pay, wages, hours and other conditions of employment for all employees in the tool room at the Greenville plant, excluding supervisors.

As a member of the union, Plaintiff was required to comply with the International Union's constitution. Const. of the Int'l Union art. 6, § 2(a). All members of the local union are also members of the International Union and subject to orders, rulings and decisions of the International Union. *Id.* § 14. The International Union and local unions are the exclusive representatives of each member for purposes of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment, and for the negotiation and execution of contracts with employers covering all such matters. *Id.* § 15.

The CBA defines the hours of work, wages, compensation for shifts, shift premiums, and the standards for earning overtime. It sets forth the wages for each of the three years covered by it. The premise for granting yearly increases is set forth as follows:

---

[2] Since 1998, three CBAs have governed Plaintiff's employment. The terms that are relevant to this motion are identical in each.

The wage increases provided herein recognizes that a continuing improvement in the standard of living of employees depends upon technological progress, better tools, methods, processes and equipment, and a cooperative attitude on the part of all parties in such progress.

A memorandum incorporated into the CBA states that Defendant is committed to reviewing opportunities for tool room employees to attend trade shows, seminars, classes, etc., which would enhance their abilities and "be in line with improving current processes, tools, machines or the development of new ones." The CBA also contemplates that tool room employees will be called upon to work on "special projects."

The CBA contains a management rights clause that grants Defendant the following rights:

The right to hire, promote, discharge or discipline for cause, to maintain discipline and efficiency of employees, and to relieve employees from duty because of inefficiency or lack of work, is the sole responsibility of the Company subject to the right of appeal through the grievance procedure.

In addition, the products to be manufactured, the location of plants, placement and use of machinery, the schedules of production, the methods, processes and means of manufacturing are solely and exclusively the responsibility of the Company.

The CBA describes job classifications, including that of a tool and die maker. Under the CBA, refusing to perform work within an employee's classification is an offense that subjects the employee to dismissal. Also, an employee is prohibited from doing work other than the employee's regular duties, unless requested to do so by the supervisor.

In 1996, Defendant published job descriptions for the Greenville plant employees, including a description for each job classification set forth in the CBA. *See* Def.'s Mot. Dismiss Ex. C-2. Under the tool and die maker job description, the specific job duties include the duty to assist Defendant in the "design, manufacture and development of new tools or processes working closely with Engineering and other department personnel." The CBA does not explicitly address

"inventions" or "intellectual property" created by tool and die makers, or other union employees. The CBA specifies a mandatory, multi-step grievance procedure; Plaintiff never filed a grievance regarding any of the claims that he asserts in this action. Pl. Dep. vol. 1, 54:12-13, July 11, 2008.

With at least some degree of regularity, Defendant's Greenville plant composed teams of employees from various job classifications, including hourly workers, with the purpose of the teams being to share ideas and work together to create and develop new methods and processes as well as the improvement of existing methods and processes. *Id.* 22-25, 91-92. Plaintiff has served on several teams at the Greenville plant and concedes that work to improve processes was generally done as a team effort. *Id.* 22-26.

Plaintiff was a member of a team formed on or about July 19, 2000, which had as its object the elimination of the height broach and facing machines from an existing process. *Id.* 117-23; Def.'s Mot. Dismiss Ex. E (minutes from July 19, 2000 meeting). The team's mission was to "conceptualize the process." Def. Mot. Dismiss Ex. E. The team's ground rules state that "out of the box thinking is what this team will need. We are limited only by your imagination." *Id.* Plaintiff agreed with and accepted these boundaries, mission, and rules. Pl. Dep. vol. 1, 119-20.

On October 31, 2000, the team came to a consensus to pursue a proposed process, the components of which essentially were the components of what became the GRLX process, which is the process at issue in this case. *Id.* 175-80. At a meeting on November 13, 2000, the team discussed the project to create a die that would achieve this process. *Id.* 187-88. During this meeting all team members were charged with developing die design concepts to present at the next meeting. *Id.* 181, 186-90.

Plaintiff testified that he presented a die design concept to the team at its next meeting, on

November 29, 2000. *Id.* 190-93. He also testified that he created initial drawings of the "invention" while at home. *Id.* 77-82. The concept that Plaintiff presented called for elimination of the height broach and facing machines, which was the team's original goal. *Id.* 65-67; Def. Mot. Dismiss Ex. E. Plaintiff presented his concept to the team to help it further its goal. Pl. Dep. vol. 1, 90-91. Plaintiff claims that he developed the concept because he was reenergized after learning that the team would have a new leader. *Id.* 75-77. Plaintiff continued serving on the team until about April 1, 2002. *Id.* 305-07; Pl. Dep. vol. 2, 316-17, July 17, 2008.

Plaintiff testified that the "Greenville plant wanted to keep this process that it was working on secret." Pl. Dep. vol. 1, 112. Plaintiff testified that it was not his job to invent. *Id.* 94-95. Plaintiff testified that after his invention was disclosed to Defendant and developed, he was approached by Ben Sowerby, the operations manager, who asked him to sign an invention disclosure form and to assign his invention to Defendant. *Id.* 114. According to the invention disclosure form, Plaintiff helped to invent the following:

> The GRLX process provides a very low cost production process to the conventional bearing production process as known and used today throughout most of the bearing production. It involves removing 2 major machine processes (facing and height broaching) out of the conventional process. It results in faster set up times, better quality product, less scrap, greater material savings, less indirect support.

Pl. Op. Br. Ex. 1 (invention disclosure form).

Plaintiff testified that his supervisor and other managerial employees could not or would not answer Plaintiff's questions about the invention disclosure form, and therefore, Plaintiff refused to sign the document. Pl. Dep. vol. 1, 114. According to Plaintiff, his supervisor told him that there would be monetary consideration if he signed the document. *Id.* 113.

Plaintiff approached the union president, Gary Christenson, concerning his questions about

the document.  Pl. Dep. vol. 2, 331.  Christenson contacted Region 1D of the UAW, after which he

provided Plaintiff with the name of a patent lawyer, who is currently Plaintiff's counsel.  *Id.* 334.

Defendant removed Plaintiff's name from the invention disclosure form.  Plaintiff alleges that the

six employees that signed the invention disclosure form received financial remuneration from

Defendant.

Finally, Plaintiff relies on Ben Sowerby's deposition for the following propositions:

1. It was not Plaintiff's job to invent.

2. Engineers are required to sign over any intellectual property to Defendant as part of their employment agreement.

3. The CBA does not cover or even mention matters dealing with trade secrets, patents, copyrights, or any intellectual property issues.

4. The hourly job description submitted in support of Defendant's motion to dismiss is not authorized or recognized by the CBA.

5. No union representative has signed or approved Defendant's hourly job description for a tool and die maker.[3]

III

Defendant moves to dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(1)

for lack of subject matter jurisdiction and pursuant to Federal Rule of Civil Procedure 12(b)(6) for

failure to state a claim because Plaintiff's claims are pre-empted by § 301 of the LMRA.  Rule

12(b)(1) motions can be raised at any time, even after trial and the entry of judgment.  Fed. R. Civ.

P. 12(h)(3); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006).  Likewise, Rule 12(b)(6) motions

---

[3] Plaintiff did not file the relevant portions of Sowerby's transcript with the Court at the time that he filed his response to Defendant's motion.  However, on December 5, 2008, after the Court canceled the hearing on Defendant's pending motions and indicated that an order would issue, Plaintiff filed Sowerby's complete deposition transcript, along with the complete deposition transcripts of several other individuals. Rather than sifting through hundreds of pages of deposition testimony to verify the accuracy of Plaintiff's representations of Sowerby's testimony, the Court has determined that whether Sowerby's testified as alleged has no impact on the analysis of the issues presented in Defendant's motion to dismiss.

can be raised in any pleading, by motion, or at trial.  Fed. R. Civ. P. 12(h)(2).

When a defendant challenges subject matter jurisdiction through a motion to dismiss, the plaintiff bears the burden of establishing jurisdiction. *Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002).  In reviewing a 12(b)(1) motion, the court may consider evidence outside the pleadings to resolve factual disputes concerning jurisdiction, and both parties are free to supplement the record by affidavits.  However, where a defendant argues that the plaintiff has not alleged sufficient facts in the complaint to create subject matter jurisdiction, the trial court accepts the allegations in the complaint as true. *Nichols v. Muskingum Coll.*, 318 F.3d 674, 677 (6th Cir. 2003) (internal citations omitted).

To survive a Rule 12(b)(6) motion, a plaintiff's complaint "must contain either direct or inferential allegations respecting all the material elements [of the claim] to sustain a recovery under some viable legal theory." *First Am. Title Co. v. Devaugh*, 480 F.3d 438, 444 (6th Cir. 2007) (internal quotation omitted).  "When a court is presented with a Rule 12(b)(6) motion, it may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss, so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).  If matters outside the pleadings are presented and not excluded by the court in a 12(b)(6) motion, the motion must be treated as one for summary judgment under Federal Rule of Civil Procedure 56. Fed. R. Civ. P. 12(d).

"Motions to dismiss . . . for lack of subject matter jurisdiction can fall into two general categories: facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).  "A facial attack is a challenge to the sufficiency of the pleading itself." *Id.*  In such an

attack, the court takes the material allegations of the complaint as true, and construes them in the light most favorable to the nonmoving party. *Id.* (internal citation omitted.) A factual attack challenges "the factual existence of the subject matter jurisdiction." *Id.* On such a motion, "no presumptive truthfulness applies to the factual allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* (internal citation omitted). In reviewing a factual attack on jurisdiction, the court has "wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990) (internal citations omitted).

IV

Defendant bases its motion to dismiss on two main arguments. First, Defendant argues that this Court lacks subject matter jurisdiction over Plaintiff's state law claims because the NLRB has sole and exclusive jurisdiction over them under § 8 of the NLRA based on the *Garmon* doctrine and the fact that Plaintiff's allegations arguably constitute unfair labor practices under the NLRA. Second, Defendant argues that the Court must dismiss Plaintiff's state law claims because they are pre-empted by § 301 of the LMRA, and Plaintiff's complaint was not timely under the six-month statute of limitations applicable under the LMRA.

A

Under the *Garmon* doctrine, "federal courts do not have jurisdiction over activity which is 'arguably subject to § 7 or § 8 of the [NLRA],' and they 'must defer to the exclusive competence of the [NLRB].' " *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83 (1982) (quoting *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245 (1959)); *Trollinger v. Tyson Foods, Inc.*, 370 F.3d

602, 609 (6th Cir. 2004). The *Garmon* doctrine "not only mandates the substantive pre-emption by the federal labor law in the areas to which it applies, but also protects the exclusive jurisdiction of the NLRB over matters arguably within the reach of the [NLRA]." *Local 926, Int'l Union of Operating Eng'rs v. Jones*, 460 U.S. 669, 680 (1983).

The NLRB retains exclusive jurisdiction over activity that may constitute an unfair labor practice under § 8(a) of the NLRA, 29 U.S.C. § 158(a). *Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 393 n.11 (1986). Unfair labor practices include, inter alia, when an employer "refuse[s] to bargain collectively with the representatives of its employees," 29 U.S.C. § 158(a)(5), and when a labor organization or its agent "refuse[s] to bargain collectively with an employer." *Id.* § 158 (b)(3). The obligation to bargain collectively is the obligation of the employer and the union "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party." *Id.* § 158(d).

Congress deliberately left the words, "wages, hours, and other terms and conditions of employment," undefined and intended to allow the NLRB to further define them. *First Nat'l Maint. Corp. v. N.L.R.B.*, 452 U.S. 666, 675 (1981). The NLRB has broad discretion to determine the mandatory subjects of bargaining under § 8(d). *N.L.R.B. v. Prod. Molded Plastics, Inc.*, 604 F.2d 451, 453-54 (6th Cir. 1979) (citing *Ford Motor Co. v. N.L.R.B.*, 441 U.S. 488 (1979)). Where uncertainty exists as to whether an issue may be classified as a managerial decision or a condition of employment, a "guideline to follow" is "whether requiring bargaining over this sort of decision will advance the neutral purposes of the [NLRA], namely promotion of labor-management relations

-12-

and the collective-bargaining process without unduly burdening management's right freely to choose the basic direction of the corporate enterprise." *N.L.R.B. v. Plymouth Stamping Div., Eltec Corp.*, 870 F.2d 1112, 1115 (6th Cir. 1989) (internal quotations omitted).

An employer violates § 9(a) of the NLRA and commits an unfair labor practice under § 8(a)(5) if it "disregard[s] the bargaining representative by negotiating with individual employees, whether a majority or a minority, with respect to wage, hours and working conditions." *Medo Photo Supply Corp. v. N.L.R.B.*, 321 U.S. 678, 684 (1944) (internal citations omitted). Such conduct constitutes an unfair labor practice because it interferes with the protected rights of employees "to bargain collectively through their chosen representatives." *Id.* Furthermore, an employer violates its duty to bargain collectively when it implements unilateral changes in the wages, hours, and other terms or conditions of employment for bargaining unit employees while a CBA is in effect. *Beverly Health and Rehab. Servs., Inc. v. N.L.R.B.*, 297 F.3d 468, 479 (6th Cir. 2002).

The NLRA similarly prohibits union employees from bypassing their own unions and attempting to negotiate directly with their employers to obtain additional benefits not provided in their CBAs. *Emporium Capwell Co. v. W. Addition Cmty. Org.*, 420 U.S. 50 (1975). In *Barbieri v. United Techs. Corp.*, the state court refused to enforce the individual contracts alleged by the plaintiffs because the court "would run the risk of placing [its] imprimatur on conduct that at least *arguably*, violates §§ 7 or 8 of the[NLRA]." 771 A.2d 915, 936 (Conn. 2001) (emphasis in original). The court found that it was without jurisdiction to proceed because "the issue of the enforceability of the alleged individual contracts . . . is neither of 'peripheral concern' to federal labor law, nor does it touch 'interests so deeply rooted in local feeling and responsibility' to avoid the broad pre-emptive scope of the [NLRA] under *Garmon*." *Id.* (citing *Davis*, 476 U.S. at 392).

Defendant argues that Plaintiff's claims are pre-empted because they directly impact wages and the terms and conditions of employment, which will have the effect of changing, without collective bargaining, the following:

1.  the relationship between Defendant and Plaintiff's union reflected in the CBA,

2.  the wage provision of the CBA, which sets forth the expectation that every employee will help develop new tools, methods, and processes,

3.  the scope of Plaintiff's job, which includes assisting in the design and development of new tools and processes,

4.  the longstanding practice of the Greenville plant to include Union employees on innovation teams and pay them their CBA hourly wage for that work, and

5.  Defendant's use of employee inventions without paying a special compensation.

Plaintiff's response does not directly respond to Defendant's argument that Plaintiff's claims are pre-empted by § 8 of the NLRA under the *Garmon* doctrine. This is significant, as Plaintiff "bears the burden of demonstrating jurisdiction, 'by competent proof.' " *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 433-34 (6th Cir. 2005) (quoting *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942)); *Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 225 (6th Cir. 2007).

Arguably, based on the structure of Plaintiff's response, its appears that Plaintiff relies on *Caterpillar v. Williams*, 482 U.S. 386 (1987), for the proposition that if an individual agreement can be interpreted without reliance on a CBA, then a plaintiff's claims based on the individual agreement are not pre-empted. In *Caterpillar*, the U.S. Supreme Court found that the defendant could not remove the case from state court to federal court simply by alleging the defense that the plaintiffs' claims to enforce individual contracts were pre-empted by § 301 of the LMRA. While a plaintiff generally "may avoid federal jurisdiction by exclusive reliance on state law," the Court recognized:

> [T]he pre-emptive force of § 301 is so powerful as to displace entirely any state cause of action 'for violations of contracts between an employer and a labor organization.' Any such suit is purely a creature of federal law, notwithstanding the fact that state law would provide

a cause of action in the absence of § 301.

*Id.* at 394 (quoting *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 23 (1983)).  However, the Court found that such "complete pre-emption" did not apply to the plaintiff's complaint because the complaint was not "substantially dependent upon interpretation of the [CBA]" when the individual agreements had been entered into by the parties at a time when the individual employees were not subject to a CBA.  *Id.* at 394-96.  Accordingly, the Court found that Plaintiff's complaint did not state claims "arising under federal law," as is required for removal to federal court.  *Id.* at 398-99.

Plaintiff does not explain how this analysis is relevant to whether the NLRB has exclusive jurisdiction over Plaintiff's claims under the NLRA and the *Garmon* doctrine.  Moreover, the fact that the *Caterpillar* court found that federal jurisdiction did not exist to support removal of the plaintiff's claims to federal court does not support the proposition that jurisdiction over Plaintiff's claims exists in this Court.  In fact, the above analysis indicates that Plaintiff's claims are within the exclusive jurisdiction of the NLRB because the substance of Plaintiff's claims are "arguably within the reach" of § 8 of the NLRA.  *See Jones*, 460 U.S. at 680; *Garmon*, 359 U.S. at 245.

However, the U.S. Supreme Court has stated that "the *Garmon* doctrine is 'not relevant' to actions within the purview of § 301."  *William E. Arnold Co. v. Carpenters Dist. Council of Jacksonville and Vicinity*, 417 U.S. 12, 16 (1974) (quoting *Local 174 Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 101 n.9 (1962)).  That is, when "the activity in question also constitutes a breach of a [CBA], the [NLRB's] authority 'is not exclusive and does not destroy the jurisdiction of the courts in suits under § 301.' " *Id.* (quoting *Smith v. Evening News Ass'n*, 371 U.S. 195, 197 (1962)).  Accordingly, the Court will undertake the § 301 analysis.

-15-

If Plaintiff's claims are pre-empted by § 301 of the LMRA, they are not within the exclusive jurisdiction of the NLRB and Plaintiff could potentially maintain a claim under § 301. However, to avoid dismissal of a claim under § 301, an action must have been filed within the six-month statute of limitations applicable under § 301. In the alternative, if Plaintiff's claims are not pre-empted, that is, they are not within this Court's jurisdiction under § 301, then the claim remains within the exclusive jurisdiction of the NLRB. For the reasons stated below, the Court finds that Plaintiff's claims are pre-empted by § 301 of the LMRA because "proof of the state law claim[s] requires interpretation of the [CBA] terms." *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 216 (6th Cir. 1994) (citing *Allis-Chalmers Corp v. Lueck*, 471 U.S. 202, 210 (1985)). Additionally, the Court finds that Plaintiff cannot maintain a claim under § 301 because his claims are time-barred. Accordingly, the Court will dismiss Plaintiff's complaint with prejudice.

## 1

Section 301 provides that "[s]uits for violation[s] of contracts may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a). "[S]ection 301 pre-empts state law rules that substantially implicate the meaning of [CBA] terms." *DeCoe*, 32 F.3d at 216. However, if the state law claim "can be resolved without interpreting the [CBA] itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." *Id.* (quoting *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 409-10 (1988)).

The Sixth Circuit Court of Appeals has a two-step approach for determining whether § 301 pre-empts a particular state-law claim:

First, the district court must examine whether proof of the state law claim requires interpretation of the [CBA] terms . . . Second, the court must ascertain whether the right claimed by the plaintiff is created by the [CBA] or by state law. If the right both is borne of state law and does not invoke contract interpretation, then there is no pre-emption. However, if neither or only one criterion is satisfied, section 301 pre-emption is warranted.

*Id.* (internal citation omitted). The Sixth Circuit has found that § 301 pre-empts state law claims by union employees who allege the existence of individual contracts separate and distinct from their CBAs. *See, e.g.*, *Maushund v. Earl Smith, Inc.*, 795 F.2d 589 (6th Cir. 1986); *Fox v. Parker Hannifin Corp.*, 914 F.2d 795 (6th Cir. 1990); *Jones v. Gen. Motors Corp.*, 939 F.2d 380 (6th Cir. 1991).

In *Maushund*, the Sixth Circuit affirmed the district court's holding that § 301 pre-empted a claim by a union member that his discharge violated an individual oral agreement in which the employer allegedly promised not to discharge him without cause. 795 F.2d at 589-91. The court held that it was "beyond question" that the employee "must look to federal labor law for any relief and that his sole remedy, if any, lies not in state law but in the terms of the [CBA]," when it was undisputed that the plaintiff was a member of a union and that the plaintiff was covered by a CBA between the union and his employer. *Id.* at 590. The court also noted that "[t]he collective bargaining process prohibits [the plaintiff] from engaging in separate negotiations with the company and precludes any actions to enforce such an agreement." *Id.*; *see also Jones*, 939 F.2d at 383 (noting that if the alleged right of the plaintiff under the agreement at issue had not been directly created by the CBA, "it would have been the product of an individual contract for employment, which is itself forbidden by the CBA"). Significantly, the court noted that while the plaintiff may have been able to state a claim under § 301 of the LMRA, the plaintiff did not appeal the district court's holding that his claims were time-barred under § 301.

In *Fox*, the court relied on *Maushund* and reiterated that "employees covered by a CBA cannot rely upon the existence of a separate, individual employment contract giving rise to state law claims." 914 F.2d at 801 (citing *Ulrich v. Goodyear Tire & Rubber Co.*, 884 F.2d 936, 938 (6th Cir. 1989)). The court found that the plaintiff's state law claims were pre-empted by § 301 because "the existence of the so-called 'state law claim' is inextricably intertwined with the CBA" when it depended on "the practices of the workplace under the CBA." *Id.* (internal quotations omitted). *See also Jones*, 939 F.2d at 382-83 (finding that a breach of contract claim arising out of a settlement agreement between an employer and an employee reached related to a grievance under a CBA was pre-empted under § 301, even though the claims did not directly involve interpretation of the CBA). The court also distinguished *Caterpillar*, because Fox "worked under a CBA throughout her tenure with the Company." *Fox*, 914 F.2d at 801 n. 5.

Defendant cites an additional case, *McCarty v. Reynolds Metal Co.*, 883 F.Supp. 356 (S.D. Ind. 1995), which is factually similar to this case, although not precedential. In *McCarty*, the plaintiff brought claims for breach of contract and unjust enrichment. *Id.* at 359. The plaintiff developed a new process designed to eliminate maintenance down-time and increase production rates. *Id.* at 358. He allegedly did this "on his own time and while working at his residence." *Id.* The plaintiff alleged that the defendant and he entered into an oral agreement concerning the defendant's use of the process under which the defendant agreed to promote him to a supervisory position if the invention reduced down-time and increased production. *Id.* at 358-59.

The court found that the plaintiff's claims were pre-empted when the CBA provided that the work covered by it included all designing and experimental work connected with the trade as well as the making of all parts and machinery and equipment. *Id.* at 361. The plaintiff's claims

implicated the bargaining agreement because it required the fact-finder "to examine the CBA to determine whether he is seeking additional compensation for work he was already duty-bound to complete" and would have to "interpret the CBA to determine the reasonableness of his expectation to receive additional compensation for the completion of that work." *Id.* The court also noted that "[b]ecause a side agreement between a union employee and an employer concerning work covered by the CBA is only effective insofar as it accords with the [CBA], [the plaintiff's] individual contract claim is thus effectively a claim for breach of the CBA." *Id.* at 362 (internal quotations omitted).

Defendant argues that Plaintiff's claims in this case are pre-empted by LMRA § 301 because they require the Court and the jury to interpret the CBA and to review customs and practices of the Greenville plant as they relate to the CBA, including the following:

1. The Recognition Clause, which states that the Union is the exclusive bargaining agent in regards to rates of pay, wages, hours and other conditions of employment for Plaintiff and other Union members.

2. The provisions of the Union Constitution that: all members of the Local Union are also members of the International Union and subject to orders, rulings and decisions of the International Union; the International and Local Unions are the exclusive representatives of each member for purposes of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment, and for the negotiation and execution of contracts with employers covering all such matters; the International and Local Unions are each member's exclusive agents in any forum as to "any matter affecting her/his status as an employee or as a member of her/his Local Union or the International Union," and with respect to the presentation, prosecution, adjustment and settlement of "all grievances, complaints or disputes of any kind or character arising out of the employer-employee relationship.

3. The Management Rights Clause, which grants Defendant the exclusive right to determine "the products to be manufactured, the location of the plants, placement and use of machinery, the schedules of production, the methods, processes and means of manufacturing."

4. The mandatory grievance procedure, which serves as the exclusive method for Plaintiff and other Union employees to resolve disputes relating to their employment.

5. The wage provision, which provides the sole basis for compensation and sets a maximum hourly rate of pay for Plaintiff, and the wage progression schedules, which provide automatic increases in that rate of pay that are expressly premised on "technological progress, better tools, methods, processes and equipment, and a cooperative attitude on the part of all parties in such progress."

6. The 1998 Memo for Record regarding "Technical Enhancement," which states the parties' mutual commitment to providing training opportunities for Union members in order to improve "current processes, tools, machines, or the development of new ones."

7. The provision that shows that "experimental" work is within the scope of work of all Tool Room employees.

8. The provision that shows that Tool Room employees would be called upon to work on "special projects."

9. Plaintiff's job description in effect since 1996, which specifically requires that Plaintiff assist in the "design, manufacture and development of new tools or processes working closely with Engineering and other department personnel" and perform "other duties as required."

10. The practice and custom of Defendant to include hourly employees on teams whose purpose is to create and develop new manufacturing processes or methods, and to pay such hourly employees their wage prescribed by the applicable CBA for serving on such teams.

11. The specific practice of Defendant beginning in July 2000, under which a team of hourly and salaried employees was created for the express purpose of "conceptualizing" a new process for manufacturing rod bearings, which process was to include the very concept that Plaintiff alleges he developed. Plaintiff was a voluntary member of the team, and he worked with the team for four months before he developed his alleged concept. The team specifically charged its members on November 13, 2000 to develop "die design concepts," following which Plaintiff allegedly presented to the same team his "concept" on November 29, 2000. Plaintiff continued to serve on the team until April 2002, actively helping the team use his concept and develop the new process. He was paid his prescribed hourly wage under the applicable CBA for all time he spent working with the team.

Plaintiff relies on several cases to attempt to avoid pre-emption under § 301. First, Plaintiff relies on *Caterpillar v. Williams*, 482 U.S. 386 (1982). As discussed above, *Caterpillar* is not compelling because the employees who sought to enforce individual agreements had not been governed by a CBA at the time that the alleged agreements were entered into by the parties. Here, Plaintiff's employment was governed by a CBA at all relevant times.

Plaintiff also relies on *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 248 (1984), in which

-20-

the Court held that the plaintiff's claims under a state whistleblower protection act were not pre-empted under the Railway Labor Act, 45 U.S.C. § 151 et seq. The plaintiff's employment had been terminated after he refused to sign a maintenance record as required by the governing CBA. *Id.* The Court found that "as long as the state-law claim can be resolved without interpreting the [CBA] itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." *Id.* at 262 (quoting *Lingle*, 486 U.S. at 408-10). In *Lingle*, the Court found that the plaintiff's claims for retaliation under state worker's compensation laws were not pre-empted because "purely factual questions" about an employer's conduct and motives do not require a court to interpret any term of a CBA. 486 U.S. at 407.

Plaintiff also relies on *O'Shea v. Detroit News*, 887 F.2d 683, 684 (6th Cir. 1989), in which the court found that a state wrongful death suit was not pre-empted by § 301. According to Plaintiff's description, the suit was a straightforward wrongful death action, in which the primary issues were whether or not the defendant-employer knew of the employee's heart condition, and whether or not the employer had placed the employee on a strenuous night shift in order to force him to retire. Accordingly, there was no need to interpret the CBA. *Id.* at 684-85.

Based on the above caselaw, Plaintiff argues that his claims are not pre-empted because Plaintiff's claims do not require interpretation of the CBA. Plaintiff emphasizes that the CBA contains no language pertaining to trade secrets or other forms of intellectual property. Plaintiff also emphasizes that the *McClarty* court noted that only claims "founded directly on rights created by [CBAs] or substantially dependent on analysis of a CBA," are pre-empted. 883 F.Supp at 360.

Plaintiff's claims are, however, substantially dependent on analysis of the CBA. In reviewing Plaintiff's trade secret claim (count I), the fact-finder must determine, among other things,

whether the bearing manufacturing process allegedly created by Plaintiff was in fact a "trade secret" and whether Defendant's alleged use of the manufacturing process constitutes "misappropriation." Mich. Comp. Laws §§ 445.1902(b), (d) and 445.1904. To prove misappropriation, Plaintiff must prove that Defendant acquired the alleged trade secret by "improper means" or disclosed it after using improper means to acquire knowledge of it. *Id.* § 445.1902(a). This will require that the fact-finder to examine:

1. whether Plaintiff's alleged concept was conceptualized and developed as part of Plaintiff's regular job duties,

2. Plaintiff's job description and CBA job classification,

3. the Management Rights clause and the customs and practices at the Greenville plant under that clause,

4. the wage provision, which sets the sole basis for compensating hourly employees,

5. the wage progression schedules, which provide that the yearly increases in rate of pay are expressly premised on "technological progress, better tools, methods, processes and equipment, and a cooperative attitude on the part of all parties in such progress,

6. the other CBA provisions that show that Defendant and the Union expected the covered employees to improve and develop new methods, processes, tools, and machines, perform experimental work, and work on special projects,

7. the practices and customs of the Greenville plant, under which it routinely included Union employees on teams whose purpose was to create and develop new manufacturing process and methods and paid such employees their CBA wage for such work,

8. the specific practice of the Greenville plant beginning in July 2000, under Plaintiff voluntarily participated on a team whose purpose was to "conceptualize" a new process, which process was expected by the team to include the very concept Plaintiff says he invented, the elimination of facing and height broach machines, for which time Plaintiff was paid his hourly wage specified in the CBA.

With respect to Plaintiff's claim for quantum meruit (count II), Plaintiff must establish (i) the receipt of a benefit by Defendant from Plaintiff and (ii) an inequity resulting to Plaintiff because of the retention of the benefit by Defendant. *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d

898 (Mich. Ct. App. 2006). A fact-finder would need to review all of the same CBA provisions and Greenville plant practices as they relate to the CBA listed above for count I.

With respect to counts III and IV for equitable[4] and promissory estoppel, Plaintiff must prove that he relied on promises made by Defendant and that his reliance was reasonable under the circumstances. *See, e.g.*, *Barber v. SMH (US), Inc.*, 509 N.W.2d 791 (Mich. Ct. App. 1993). Measuring the reasonableness of Plaintiff's reliance will require this Court and a jury to examine all of the same CBA provisions and Greenville plant practices as they relate to the CBAs listed above for count I.

With respect to count V, for breach of an express contract, Plaintiff must prove the following elements: (1) a valid contract; (2) breach; and (3) damages. *Oakland Metal Stamping Co. v. Forest Indus. Inc.*, 89 N.W.2d 503 (Mich. 1958). Alternately, the elements of a breach of implied contract claim are receipt of a benefit by the defendant from the plaintiff, which benefit is inequitable for the defendant to retain. *In re McCallum Estate*, 395 N.W.2d 258 (Mich. Ct. App. 1986). Whether Defendant and Plaintiff could enter into such a contract is inextricably intertwined with the CBA and federal labor law. Whether a duty to Plaintiff existed or could be implied or was breached will require the fact-finder to review all of the same CBA provisions and Greenville plant practices as they relate to the CBA listed above in relation to Count I.

With respect to count VI, conversion is defined generally as an "any act of domain wrongfully exerted over another's personal property in denial or inconsistent with the rights

---

[4] According to Defendant, Michigan law does not recognize equitable estoppel as a cause of action. Defendant cites, inter alia, *Van v. Zahorik*, 575 N.W.2d 566 (Mich. Ct. App. 1997), *Hoye v. Westfield Ins. Co.*, 487 N.W.2d 838 (Mich. Ct. App. 1992), and *Casey v. Auto Owners Ins. Co.*, 729 N.W.2d 277 (Mich. Ct. App. 2006). It is unnecessary for the Court to address this argument.

therein." *Sarver v. Detroit Edison Co.*, 571 N.W.2d 759 (Mich. Ct. App. 1997) (internal citations omitted). The determination of whether Plaintiff's concept was his "property" or whether Defendant's development and use of Plaintiff's alleged concept was "wrongful" requires the fact-finder to examine all of the same CBA provisions and Greenville plant practices as they relate to the CBA listed above for Count I.

Although Defendant's motion raised each of the ways the CBA is implicated as listed above, Plaintiff's response did not attempt to explain why Defendant's assertions regarding each claim's dependence on the CBA are inaccurate. Plaintiff simply states that the case "turns upon questions of factual situations that are simply not covered by the CBA. [For example,] [w]hat shall Plaintiff be paid if he indeed, invented something. Something Plaintiff was not required to do and something that Plaintiff allegedly did at home on his own time." However, a determination of whether Plaintiff was "required" to "invent" depends on interpretation of the CBA. Plaintiff cannot avoid this simply by pointing out that the CBA does not include the word "invent." Based on the above, the Court finds that Plaintiff's claims are pre-empted by § 301 of the LMRA because "proof of the state law claim[s] requires interpretation of the [CBA] terms," *DeCoe*, 32 F.3d at 216, and the claims are substantially dependent on analysis of a CBA.

## 2

In order for Plaintiff to maintain a claim under § 301 of the LMRA, the claim must have been brought within the six-month statute of limitations. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 169 (1983). The statute of limitations begins to toll "when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation" of the CBA. *Noble v. Chrysler Motors Corp.*, 32 F.3d 997, 1000 (6th Cir. 1994) (internal quotation

omitted).  Plaintiff first filed a claim in state court in August 2005.  *See Frederick v. Federal-Mogul Corp.*, 733 N.W.2d 57, 58 (Mich. Ct. App. 2007).  Plaintiff alleges in his complaint that Defendant began using the GLRX process at issue in March 2003, in violation of the agreement that he alleges he had with Defendant.  *See* Am. Compl. ¶¶ 10, 11.[5]  In addition, Plaintiff was presented with the invention disclosure form, which he refused to sign, in or about September 2003.  *See* Pl. Op. Br. Ex. 1 (invention disclosure form).  Based on the above, the Court finds that the statute of limitations began to toll greater than six months before Plaintiff first filed a claim in August 2005.  Accordingly, any potential claim that Plaintiff has under § 301 of the LMRA is time-barred.

Even if Plaintiff's potential § 301 claim were not time-barred, it would still fail as a matter of law, as Plaintiff admits he never filed a grievance, and therefore did not exhaust his mandatory grievance and arbitration remedies before initiating this litigation.  *See DelCostello*, 462 U.S. at 163 (stating that ordinarily, "an employee is required to attempt to exhaust any grievance or arbitration remedies provided in the [CBA]," before bringing a claim under § 301).

V

Accordingly, it is **ORDERED** that Defendant's motion to dismiss [Dkt. # 115] is **GRANTED**.

It is further **ORDERED** that Defendant's motion to strike Plaintiff's experts [Dkt. # 114] and Defendant's motion for summary judgment [Dkt. # 116] are **DENIED AS MOOT**.

It is further **ORDERED** that Plaintiff's motion for leave to file supplemental expert reports as exhibits in opposition to Defendant's motion to strike experts [Dkt. # 152] is **GRANTED**.

---

[5]  Defendant asserted in its motion to dismiss that Plaintiff was aware of the use in March 2003; Plaintiff did not dispute this allegation in his response.

It is further **ORDERED** that Plaintiff's complaint is **DISMISSED WITH PREJUDICE**.

                                         s/Thomas L. Ludington

                                         THOMAS L. LUDINGTON

                                         United States District Judge

Dated: December 12, 2008

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 12, 2008.

                        s/Tracy A. Jacobs

                        TRACY A. JACOBS

---